# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **NORMAN "RUSS" ADAMS and** | ) | |
| **BRENDA ADAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:19-cv-00878** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **DELK INDUSTRIES, INC., d/b/a** | ) | |
| **DELK PRODUCTS, INC., and** | ) | |
| **RAYMOND DON BARNES,** | ) | |
| **individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court are (1) the defendants' Motion for Judgment on the Pleadings (Doc. No. 49); and (2) the plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. No. 51). For the reasons set forth herein, both motions will be granted in part and denied in part.

## I.    MOTION FOR JUDGMENT ON THE PLEADINGS

### A.    Relevant Facts and Procedural Background

As set forth in both the first Amended Complaint ("FAC") (Doc. No. 16) and the proposed Second Amended Complaint ("PSAC") (Doc. No. 51-2), defendant Delk Industries, Inc. ("Delk") is a Tennessee corporation, and defendant Raymond Don Barnes, Jr. is the president and founder of Delk. Plaintiffs Russ and Brenda Adams, husband and wife, are citizens and residents of Georgia. In January 2012, Russ Adams (hereafter "Adams," except where necessary to distinguish him from Brenda Adams) and Delk, through Barnes, entered into a contract ("Royalty Agreement"), pursuant to which Adams assigned to Delk the exclusive right to "further develop and commercially exploit" a product originally developed by Adams and previously marketed by

him as the "FrostShield," a windshield cover used for keeping snow, frost, and ice from adhering to automobile windshields (the "Product"). (Royalty Agreement, Doc. No. 16-5, at 1.) In exchange, Delk agreed to pay Adams an annual royalty on the proceeds of its sales of the Product. The original term of the Royalty Agreement was five years beginning on January 30, 2012, but the term would "automatically renew for successive periods of two (2) years unless one party shall give the other written notice of its intention to terminate at least thirty (30) days prior to the end of the initial term or extension thereof." (*Id.*)

In late 2013, Adams allegedly determined that Delk had breached the Royalty Agreement by failing to remit full payment of the royalties owed. As part of continuing discussions about this issue in early 2014, Barnes proposed amending the Royalty Agreement to "reflect a new commission schedule, which was much more favorable to Delk." (Doc. No. 16 ¶ 40.)

On February 14, 2014, Barnes emailed Adams the draft First Amendment to Royalty Agreement ("Amendment" or "First Amendment") for review. (Doc. Nos. 16-1, 16-8.) The stated purpose of the Amendment was to "amicably resolve certain disagreements regarding previous royalty payments, extend the term of the Royalty Agreement and revise the royalty payment schedule." (Doc. No. 16-1, at 1.) While the original Royalty Agreement was set to expire in January 2017, unless extended, the Amendment called for an extension of the initial term until December 31, 2018, with automatic renewal "for successive periods of two (2) years unless one party shall give the other party written notice of its intention to terminate at least sixty (60) days prior to the end of the initial term or extension thereof." (*Id.*) Section 4(f) of the Amendment, entitled "Representations and Warranties," provides:

> In the event that Delk's use of the product creates trademarks, including without limitations, FrostGuard™ and FrostBlocker™ service marks, trade dress rights or other intellectual property rights in connection with the Product, Delk shall have an exclusive and irrevocable right in such trademark, service mark, trade dress or other

> intellectual property protection inclusive of patents and designs, and any involvement, modifications, or future enhancements of the Product . . . . Furthermore, Delk shall own all right, title and interest in and to the foregoing.

(*Id.* at 2.)

Adams responded to the proposal with an email request that: (1) Brenda Adams be added as a party to the Amendment; and (2) the consent of both Delk and the Adamses be required to terminate the contract. (Doc. No. 16-8, at 2.) He also requested clarification regarding the meaning of paragraph 4(f), specifically, whether this paragraph was "asking [him] to give up all interest in these products or just allow you to be fully in control with royalties still being paid to me annually and forward?" (*Id.*) Finally, he reminded Barnes that the royalty payments were his "main source of income" and that he "need[ed] protection." (*Id.*)

In response, Barnes agreed to add Brenda Adams as a party but refused to include a provision requiring the consent of both parties to terminate. His email to Adams stated, in relevant part:

> Either party has to be able to walk away from a contract at the natural termination of the agreement—this is a required element of a contract. But, it can be extended when both parties agree. All I can say is that we don't intend to go five years and then not renew if the product is still selling . . . .

(Doc. No. 16-8, at 1 (ellipsis in original).) Regarding paragraph 4(f), Barnes added: "Delk will own any protectable interest that it might create during the term of the Agreement. This would not limit your right to receive royalties, or the amount thereof, in any way." (*Id.*)

According to the plaintiffs, Barnes is a licensed attorney in Tennessee, but Adams is a "layman" who acted "without the benefit of an attorney." (Doc. No. 16 ¶¶ 7, 48.) The plaintiffs knew that Barnes was an attorney and, allegedly "[r]elying on Barnes's misrepresentations and promise of an immediate check to resolve the first royalty dispute," executed the Amendment that day. (Doc. No. 16 ¶ 56.)

The Product continued to sell well over the next several years and, according to the plaintiffs, was "still selling by the hundreds of thousands on an annual basis" as of October 1, 2018. (Doc. No. 56, at 3; *see also* Doc. No. 16 ¶ 65.) Nonetheless, on that date, Barnes, on behalf of Delk, sent notice to the plaintiffs that Delk was terminating the Royalty Agreement, as amended, effective December 31, 2018. (Doc. No. 16 ¶ 67; Doc. No. 16-11.)

Following termination, the plaintiffs attempted to meet with Barnes to discuss a continuation of the business relationship, but Barnes refused. In addition, Delk did not pay the final commission check within the required time frame, and the plaintiffs subsequently learned that Delk has been calculating royalty payments incorrectly, resulting in the underpayment of royalties to the plaintiffs since execution of the Amendment. (Doc. No. 16 ¶¶ 71–77.)

The plaintiffs filed suit against Delk and Barnes on October 2, 2019 and then, with the defendants' consent, filed the FAC on December 19, 2019, asserting claims of promissory fraud (Count I), intentional misrepresentation (Count II), breach of contract (against Delk only) for underpayment of royalties (Count III) and for impermissible termination (Count IV), declaratory judgment (against Delk only) (Count V), and statutory and common law trademark infringement claims and a Lanham Act claim (the "trademark claims") (Counts VI–VIII). (*See* Doc. No. 16.)

The defendants' Motion for Judgment on the Pleadings seeks dismissal of all claims set forth in the FAC *except* the breach of contract claim for underpayment of royalties and the declaratory judgment claim related to that alleged breach. (Doc. Nos. 49, 49-1.) The plaintiffs have filed a Response opposing the motion. (Doc. No. 56.) They do not, however, defend the trademark claims on the merits. Instead, they seek dismissal of these claims without prejudice, on the basis that the PSAC omits the claims altogether.

### B.     Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure authorizes the filing of a motion for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." The standard of review that applies to a 12(c) motion is the same as that applied to a motion under Rule 12(b)(6) for failure to state a claim for which relief may be granted. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). That is, "all well pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (citing *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)). A court should grant a motion for judgment on the pleadings under Rule 12(c) only if "no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *JPMorgan Chase Bank*, 510 F.3d at 582.

Federal Rule of Civil Procedure 8(a)(2) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The Rule "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Accordingly, to withstand a Rule 12 motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In ruling on a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"'[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss. In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one

for summary judgment.'" *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir.2007) (citing Fed. R. Civ. P. 10(c) and quoting *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)). "Further, [w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) (internal quotation marks and citations omitted).

### C.     Promissory Fraud (Count One)

The defendants argue that the promissory fraud claim is subject to dismissal for failure to state a claim for which relief may be granted and because it is time-barred.

The FAC states that the promissory fraud claim is premised upon Barnes's statements to Adams in the February 2014 email exchange that

> (1) Delk would not terminate the Royalty Agreement so long as [the Product was] still selling; (2) that Delk would not use the language of [¶ 4(f) of the Amendment] to assert ownership over the Adamses' existing trademark rights . . . ; and (3) the . . . Amendment would not "limit [the Adamses'] right to receive royalties in any way,"

(Doc. No. 16 ¶ 88.) The defendants' Motion for Judgment as to the promissory fraud claim addresses all three allegedly fraudulent statements. In their Response, however, the plaintiffs focus only on Barnes's alleged representation that Delk would not terminate the Royalty Agreement as long as the Product was selling. According to the plaintiffs, this statement constituted a promise that Delk would not terminate the agreement in December 2018 if sales were still good; the statement was false when it was made, because Barnes intended all along to terminate the Royalty Agreement, as amended, on December 31, 2018, regardless of what the sales figures were; Barnes knew the representation was false at the time it was made; and the plaintiffs reasonably relied on the misrepresentation to their detriment in deciding to execute the Amendment and suffered damages "relating to royalties owed them by Delk and relating to [their] intellectual property rights" as a result. (*Id.* ¶¶ 89–92.) They seek rescission of the Amendment. (*Id.* ¶ 93.)

### 1. Failure to State a Claim

The elements of a promissory fraud claim under Tennessee law are:

(1) an intentional misrepresentation of material fact; (2) the misrepresentation was made "knowingly," "without belief in its truth," or "recklessly without regard to its truth or falsity"; (3) the plaintiff reasonably relied on the misrepresentation and suffered damages; and (4) . . . the misrepresentation must embody a promise of future action without the present intention to carry out the promise[.]"

*Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (quoting *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)) (some internal quotation marks omitted). As a fraud claim, "it must be stated with particularity, and the plaintiff must, at a minimum, allege the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud." *Id.*; Fed. R. Civ. P. 9(b). While "intent . . . and other conditions of a person's mind may be alleged generally," *id.*, conclusory assertions as to these states of mind will not suffice "without reference to [a] factual context." *Iqbal*, 556 U.S. at 686. That is, the pleading requirements under Rule 8(a)(2) are "still operative" and apply to allegations of intent and knowledge. *Id.* (citation omitted).

The defendants argue, first, that the FAC fails to state a claim for promissory fraud with respect to Barnes's statement regarding termination in the February 2014 email, because the statement cannot fairly be characterized as a "promise"—as opposed to simply a statement of present intent regarding future events, with no representation that minds might not change in the intervening period. In response, the plaintiffs acknowledge that "Barnes spoke, technically, in the present tense with the words 'we don't intend,'" but, they argue, in light of colloquial and common usage of the word "intend," "a fair and reasonable interpretation of that statement is that 'they would not.'" (Doc. No. 56, at 10.) In support of this argument, they point out that, in the October 1, 2018 Termination Letter Barnes drafted and signed, Barnes himself wrote that Delk "intends to discontinue" the parties' contract effective December 31, 2018, when he clearly meant that Delk

would, in fact, terminate the contract as of that date. (*See* Doc. No. 16-11.) The plaintiffs point to the context in which the February 2014 statement was made and, in particular, the fact that Barnes was responding to Adams's stated concern about termination.

The court agrees with the plaintiff that, for purposes of the Motion for Judgment, at least, Barnes's statement that Delk "did not intend" to terminate the parties' agreement in December 2018 if the product was still selling can reasonably be construed as an affirmation that Delk would not terminate the parties' agreement then unless the product was not selling. This question admittedly presents a close call, but ultimately it will be for the finder of fact to determine from the context and the parties' testimony whether the statement was intended as a promise.

The defendants also argue that the plaintiffs have not pointed to any actual evidence to support their assertion that the statement was untrue when made—that is, that Barnes (and Delk) did not have a present intention, when the Amendment was executed, to extend the term if sales were still going well at the end of the initial term of the Amendment. The plaintiffs respond that (1) in the context of a motion to dismiss, the only evidence they need to present to support their claim that Barnes did not intend to keep the promise at the time he made it is that he did not keep the promise; and (2) they have other evidence in the form of Barnes's misrepresentation "about the so-called required elements of a contract." (Doc. No. 56, at 11.)

Regarding the plaintiffs' first assertion, this does not appear to be a correct statement of Tennessee law, which holds that the mere fact that a promise is not kept is *not* evidence that there was no intent to keep the promise when it was made. *See Noblitt v. Bluegreen Vacations Unltd., Inc.*, No. 3:18-CV-117, 2019 WL 7290474, at *17 (E.D. Tenn. Mar. 20, 2019) ("Not every broken promise starts with a lie." (citation omitted)); *Dog House Inv., LLC v. Teal Props., Inc.*, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014) ("When a promise is made in good faith, with the

expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or for equitable relief. Otherwise any breach of contract would call for such a remedy." (quoting *Houghland v. Sec. Alarms & Servs., Inc.*, 755 S.W.2d 769, 774 (Tenn. 1988)).

The court nonetheless finds that other facts alleged by the plaintiffs give rise to an inference that the statement was false when made, at least at this juncture. These include the fact that Barnes allegedly rushed the plaintiffs, who he knew were not represented by counsel, into executing the Amendment, knowing they were anxious to receive payment in settlement of the past claims of insufficient royalty payments; the fact that Barnes was a licensed attorney and, rather than responding to the plaintiffs' concerns about termination with a proposal either to further extend the initial term of the agreement or to limit the conditions under which termination was permitted, he cut them off by giving them what can, at best, be characterized as a truncated statement of the law of contract duration, as discussed in greater detail below. In addition, the new terms in the Amendment pertaining to trademark ownership—regardless of the plaintiffs' having now abandoned their trademark-based claims—strongly suggest that Delk was in the process of setting itself up to be able to continue selling the Product, and to continue deriving substantial income from such sales, without any need for the plaintiffs to be involved or for any portion of the income stream to be directed to them. In other words, a fair reading of the Amendment suggests that Barnes likely knew in February 2014 that, by December 2018, Delk would have no need or incentive to extend the term of the parties' agreement. Instead, it apparently could continue to sell the Product without having to pay royalties to the plaintiffs.

The court finds that the plaintiffs have adequately alleged a claim of promissory fraud based on Barnes's statement that Delk did not intend to terminate the contract in five years if the Product was still selling.

2.     *Statute of Limitations*

The parties agree that a promissory fraud claim, in Tennessee, is subject to the three-year statute of limitations codified in Tenn. Code Ann. § 28-3-105. *See Ne. Knox Util. Dist. v. Stanfort Constr. Co.*, 206 S.W.3d 454, 459 (Tenn. Ct. App. 2006) (applying § 28-3-105 to claims of negligent and intentional misrepresentation). In addition, Tennessee applies the discovery rule to fraud claims. *See, e.g.*, *Med. Educ. Assistance Corp. v. State ex rel. E. Tenn. State Univ. Quillen Coll. of Med.*, 19 S.W.3d 803, 817 (Tenn. Ct. App. 1999). Under the discovery rule, the statute of limitations is tolled, and does not begin to run, "until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained." *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 621 (Tenn. 2002) (citations omitted).

The defendants argue that the plaintiffs were, or should have been, on notice as of the execution of the Amendment that they had a cause of action for fraud, because they knew as of that date what the actual terms of the contract were and so were placed on notice of "the exact injuries they allege." (Doc. No. 49-1, at 7.) But that is not how a fraud claim works. The question is whether Barnes made fraudulent statements upon which the plaintiffs reasonably relied. The defendants have not actually argued that the plaintiffs' reliance was unreasonable, and they do not point to any action by Barnes that took place before he gave notice of non-renewal of the agreement in October 2018 that would have put the plaintiffs on notice that he and Delk never intended to extend the agreement beyond December 2018. Instead, the plaintiffs allege various actions that Adams undertook on his own to assist Delk in promoting and marketing the product—investments that he may not have made if he had known the contract would terminate in December 2018. The plaintiffs also point to their allegation that the Product continued to sell well through the fall of 2018.

The court finds, for purposes of the Motion for Judgment, that the discovery rule saves this claim. The plaintiffs filed suit on October 2, 2019, within three years of when they allege they first had reason to know that Barnes had misrepresented Delk's intent at the time of signing the Amendment, in order to induce them to sign the Amendment in the first place. The claim is not subject to dismissal on statute of limitations grounds at this juncture. The court, therefore, will deny that portion of the Motion for Judgment seeking dismissal of the promissory fraud claim premised on Barnes's assertion that Delk did not intend to terminate the contract as long as the product continued to sell. Insofar as the plaintiffs' promissory fraud claim as alleged in the FAC is premised upon other statements by Barnes, the plaintiffs appear to have abandoned that portion of the claim. The court, therefore, will dismiss any part of this claim based on other statements by Barnes.

### D.    Intentional Misrepresentation (Count Two)

The plaintiffs' intentional misrepresentation claim is premised upon Barnes's statement in the February 14, 2014 email that "[e]ither party has to be able to walk away from a contract at the natural termination of the agreement—this is a required element of a contract." (Doc. No. 16-8, at 1.) According to the plaintiffs, this was a "false statement" of "material fact," since the termination provision of the Amendment was a material term of that agreement; and Barnes, a licensed attorney, knew the statement was "a misrepresentation of the law" when he made it. (Doc. No. 16 ¶¶ 95–97, 100.) They also allege that they did not know it was false and reasonably relied on the statement to their detriment, as it induced them to sign the contract, directly resulting in damages to them. (*Id.* ¶¶ 98–101.)

The defendants argue that: (1) accepting the plaintiffs' allegations as true, the statement constitutes a false or erroneous interpretation of law, and a legal conclusion or opinion cannot serve as the basis for a claim of intentional misrepresentation; and (2) any purported reliance on

the statement was objectively unreasonable, because "it was directly contradicted by the Amendment" (*id.* at 18).

As for the latter contention, the defendants do not explain how Barnes's statement is "contradicted" by the Amendment. The court finds nothing in the Amendment that conflicts with Barnes's statement that "[e]ither party has to be able to walk away from a contract at the natural termination of the agreement." The Amendment, in fact, embodies that principle, insofar as it gave either party the ability to opt not to continue the relationship at the expiration of the original or any extended term.

More persuasive is the defendants' assertion that a statement of law cannot provide the basis for an intentional misrepresentation claim, except under narrow circumstances. Under Tennessee law, a plaintiff claiming intentional misrepresentation must prove:

> (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012).

In the context of an equitable estoppel claim, the Tennessee Court of Appeals has distinguished between representations of fact and representations of law and concluded generally that "[l]egal arguments . . . are not facts" that can be misrepresented. *Boyce v. LPP Mortg. Ltd.*, 435 S.W.3d 758, 772 (Tenn. Ct. App. 2013). As that court explained:

> Indeed, the situation presented by this case is similar to the situation wherein a party makes a material factual misrepresentation in order to induce another party to make a contract. In that situation, *Williston on Contracts* notes that misstatements as to the law do not qualify as material factual misrepresentations:

> It is well settled that a claim of fraud in the making of a contract cannot generally be supported by proof of misstatements as to matters of law. On this principle, a conscious misstatement of the meaning of certain terms in a written contract has been held immaterial.
>
> The rule, which is in essence an application of the broader principle that fraud must rest on a misrepresentation of a matter of fact, and cannot be supported by a misstatement of a matter of opinion, is based on the principle that everyone is equally capable of determining the law, is presumed to know the law and is bound to take notice of the law and, therefore, in legal contemplation, cannot be deceived by representations concerning the law or permitted to say he or she has been misled.

26 *Williston on Contracts* § 69:10 (4th ed.). . . .

*Id.* at 772 (some quotation marks and internal citations omitted); *see also Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 276 (M.D. Tenn. 2020) (Campbell, J. (quoting *Boyce* at length); *Downing v. Fidelity Nat'l Title Ins. Co.*, No. 3:16-cv-119-TCB, 2017 WL 6371196, at *7-8 (N.D. Ga. Sept. 14, 2017) (under Georgia law, "[a] claim of fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law"); *Gen. Elec. Capital Corp. v. Del. Mach. & Tool Co.*, No. 1:10-cv-00107-LJM-WGH, 2011 WL 1899203, at *3 (S.D. Ind. May 17, 2011) (dismissing fraudulent inducement claim where the plaintiff alleged that the defendant misrepresented their contract as a lease rather than a security agreement; holding that a fraudulent inducement claim, under Indiana law, may not be based on representations as to the legal effect of the document sued on, because "[e]very person is presumed to know the contents of the agreement which he signs, and has, therefore, no right to rely on the statements of the other party as to its legal effect").

In *Best Choice Roofing*, another judge of this court, citing *Boyce*, concluded that a claim of fraudulent misrepresentation could not be premised upon the counter-defendant's alleged misstatement of the law that was contained in the parties' agreement. The language at issue stated that the relationship between the parties was that of licensor/licensee and not franchisor/franchisee.

*Best Choice Roofing*, 446 F. Supp. 3d at 276. The counter-plaintiff argued that this was an untrue statement upon which she had relied to her detriment. The counter-defendants argued that the language in question "constitutes a legal opinion" and that the counter-plaintiff was "free to have that opinion confirmed by her own legal counsel before she signed the agreements." *Id.*

The court concluded that the statement purporting to define the parties' legal relationship was, based on Tennessee law, a statement of law rather than one of fact and could not support a misrepresentation claim. The court bolstered its holding by observing that "[t]he reason for requiring the 'representation' be one of fact and not law becomes clear, in this case, when one attempts to establish the veracity of the representation, *i.e.*[,] does the License Agreement actually describe a franchise?" *Id.* at 277. The court noted that the term "franchise" is defined somewhat differently in each of many different sources, including the Federal Trade Commission's Franchise Rule and at least three different Tennessee statutes. As a result, "the determination of whether the terms of the License Agreements describe a 'franchise' relationship is a legal opinion, dependent on the definition to be applied to the facts given. The resulting conclusion is not a 'fact' that can be objectively verified." *Id.* at 278.

The same consideration applies here. The plaintiffs claim that Barnes's representation ("Either party has to be able to walk away from a contract at the natural termination of the agreement—this is a required element of a contract.") is a legal statement so obviously false that "any first-year law student or business student" would know that it is false. (Doc. No. 56, at 12.) At the same time, they argue that it is a misrepresentation of the law upon which the plaintiffs reasonably relied, knowing that Barnes was an attorney. The court, however, would be hard-pressed to determine whether the statement is actually false. Certainly, parties are free to agree to the duration of their contract, and every contract can be terminated by the consent of both parties.

*See, e.g.*, *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990) ("[B]y the rules of the common law, [a] written contract may be changed, modified, or waived in whole or in part by a subsequent one, express, written, oral, or implied." (quoting 17 Am. Jur. 2d *Contracts* § 466 (1964)). Nonetheless, once the parties have agreed on a duration or an expiration date, such a term would become meaningless if the contract did not actually expire on that date unless both parties agreed to terminate. In other words, the plaintiffs' email to Barnes appeared to be asking for a contract that said something like this:

> The term of the Royalty Agreement shall be extended until December 31, 2018. It shall then automatically renew for successive periods of two years, unless both parties agree to terminate at least sixty days prior to the end of the initial term or extension thereof.[1]

Such a contract would *never* expire unless both parties agreed to terminate the relationship, making the specification of an initial period and renewal periods illusory. *See Brubaker v. Barrett*, 801 F. Supp. 2d 743, 752 (E.D. Tenn. 2011) ("A contract is also illusory if it is indefinite in nature." (citing *Jamestowne On Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990) ("Courts will not uphold agreements which are indefinite and uncertain as to the obligations imposed on the parties thereto.")). If the plaintiffs wanted a longer contract term, they could have asked for a longer initial term and longer successive terms, but they did not do so. The statement that either party "has to be able to walk away from a contract at the natural termination of the agreement" thus seems to be basically correct, or at least arguably correct, just as a matter of common sense. In any event, even if not correct, it is a viable opinion about the law.

---

[1] Paragraph 2 of the Amendment (Doc. No. 16-1) actually states:

The term of the Royalty Agreement shall be extended until December 31, 2018. It shall then automatically renew for successive periods of two (2) years unless one party shall give the other party written notice of its intention to terminate at least sixty (60) days prior to the end of the initial term or extension thereof.

Because the plaintiffs cannot show that the statement was a representation of a present or past fact that was false when it was made—as opposed to an opinion about the law regarding which reasonable minds might disagree—their intentional misrepresentation claim will be dismissed as a matter of law. The court does not reach the parties' other arguments regarding this claim.

### E.       Breach of Contract – Impermissible Termination (Count Four)

The plaintiffs' promissory fraud claim is based upon Barnes's statement that Delk did not intend to terminate the contract at the expiration of the initial term if the Product was still selling. Count Four of the FAC is pleaded "in the alternative" to the promissory fraud claim and is based on the premise that, if the same statement was not fraudulent, then it became an oral term of the Amendment, which Delk breached by giving notice of termination on October 1, 2018 and following through with the termination on December 31, 2018.

The defendants seek dismissal of this claim, pointing out that there is no dispute that they complied with the terms of the contract as written, providing the required sixty days' advance notice of termination. They argue, first, that the plaintiffs cannot "have their cake and eat it, too" (Doc. No. 49-1, at 20), apparently taking issue with the plaintiffs' assertion in Count One that Barnes's statement was fraudulent and their position in Count Four that the statement was not fraudulent. This assertion, however, fails to recognize that the plaintiff's breach of contract claim is pleaded "in the alternative" to their promissory fraud claim. (*See* Doc. No. 16 ¶ 110 ("This Count IV is pled in the alternative, in the event the Court does not void the First Amendment for Defendants' promissory fraud.").) Under the Federal Rules, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); *see also Son v. Coal Equity, Inc.*, 122 F. App'x 797, 802 (6th Cir. 2004) (citing former Fed. R. Civ. P. 8(e)(2)). For purposes of this claim, then, the court will presume that Barnes's statement was not fraudulent,

that is, that he was speaking truthfully when he wrote: "All I can say is that we don't intend to go five years and then not renew if the product is still selling . . . ." (Doc. No. 16-8, at 1.)

The defendants also argue that, for purposes of the breach of contract claim, the Amendment is a fully integrated agreement, and the parol evidence rule applies and bars the consideration of evidence of pre-contracting negotiations to contradict or vary the clear written terms of the Amendment. In response, the plaintiffs argue that the parol evidence rule does not apply here, first, because the contract does not contain a merger clause or express an intent that it be deemed fully integrated. They also contend that they are not "attempting to rely on oral statements to contradict, or even supplement, a written agreement." (Doc. No. 56, at 18.) Instead, their position is that "Barnes' written communication, made just prior to the execution of the First Amendment, and which induced Plaintiffs to sign it, is a term of the First Amendment. Plaintiffs, thus, are alleging that the two writings (Barnes' email and the First Amendment) form the parties' contract." (*Id.*) They also maintain that these two writings "can exist together and be construed in perfect harmony," thus taking the parol evidence rule out of the equation. (*Id.*)

"In general, the parol evidence rule provides that 'a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements . . . .'" *Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694–95 (Tenn. 2019) (quoting Black's Law Dictionary 1292 (10th ed. 2014)).[2] "An integrated agreement is a writing constituting a final expression of one or more

_____

[2] As the Tennessee Supreme Court noted, the "parol evidence" rule is inaptly named in at least two respects. First, "[a]lthough the term 'parol' means 'oral,' the 'parol evidence rule' is generally understood to apply to both oral and written extrinsic evidence of pre-contract negotiations between the parties." *Indiv. Healthcare Specialists*, 566 S.W.3d at 695 n. 24. Second, it is not a rule of evidence but one of substantive law. "This means that even where evidence of pre-contract negotiations that is admitted without objection is incompetent and ineffective to alter the terms of a written agreement. The question is not really whether evidence can be admitted . . . but

terms of an agreement; a completely integrated agreement has been 'adopted by the parties as a complete and exclusive statement of the terms of the agreement.'" *Id.* at 696 (quoting Restatement (Second) of Contracts §§ 209–10 (Am. L. Ins. 1981)). The question of whether an agreement is "fully integrated" or only partially integrated is an important one when a party seeks to invoke the parol evidence rule, because "the parol evidence rule is most restrictive when the contract at issue is fully or completely integrated." *Id.* That is, when the contract is "fully integrated," "the parol evidence rule prohibits the use of evidence of pre-contract negotiations in order to vary, contradict, or supplement the contractual terms." *Id.* at 697; *see also* Steven W. Feldman, 21 *Tenn. Prac. Contract Law and Practice* § 8:50 (Aug. 2020 update) (hereinafter "Feldman, 21 *Tenn. Practice* § __") ("When the contract . . . is fully or completely integrated, it . . . *may not be supplemented by additional terms*, whether consistent or inconsistent." (emphasis added)). On the other hand, if an agreement is only "partially integrated," it cannot be *contradicted* by parol evidence, but it may be "*supplemented* by consistent, additional terms." Feldman, 21 *Tenn. Practice* § 8.50 (emphasis added).

Under Tennessee law, "integration clauses, also called merger clauses, can be very important in determining whether a contract is completely integrated for purposes of the parol evidence rule." Feldman, 21 *Tenn. Prac.* § 8:49 (citations omitted). However, even if a contract does not actually contain an integration clause, that does not necessarily mean that it is not a fully integrated contract. "Whether the parties intended the writing as the final expression of their agreement is determined in the first instance from the writing itself. If a document appears to be a

---

whether, if the evidence is admitted, it will have the legal effect of varying the document." *Id.* at 696 (internal quotation marks and citations omitted).

complete agreement on its face, it is conclusively presumed to be a final, complete agreement." *Id.* (citations omitted).

In this case, the defendants argue that the Amendment contains a merger clause, or integration clause, which establishes that the parties intended the written agreement to "embody their complete and exclusive agreement." *Indiv. Healthcare Specialists*, 566 S.W.3d at 697. The plaintiffs claim that the clause to which the defendants point is not actually a merger clause, as it provides only for the execution of the agreement in counterparts and thus, at most, can be considered a partial integration clause.

The provision to which the defendants point states:

> Execution. This Amendment may be executed in counterparts, which taken together *shall constitute a single integrated agreement*. A copy of a signature to this Amendment (whether in PDF and e-mailed or sent by facsimile) shall have the same force and effect as an original signature for all documents integrated in this Amendment.

(Doc. No. 16-1, at 3 (emphasis added).) In addition, however, the Amendment specifically incorporates the Royalty Agreement, as follows:

> Ratification; Full Force and Effect. The provisions of the Royalty Agreement shall be amended *to the extent set forth herein but no further or otherwise*. The Royalty Agreement (as amended hereby) shall be in full force and effect with all covenant and provisions, except as expressly provided herein, and the parties hereby confirm and ratify the Royalty Agreement (as amended hereby) and all of its terms and provisions. . . . The covenants, conditions and agreements contained in this Amendment are binding upon and inure to the benefit of the parties hereto . . . .

(*Id.* (emphasis added).)

Regardless of whether the "Execution" clause quoted above may properly be deemed an integration clause (which it probably cannot), the court finds, based on the language of both of the quoted paragraphs in particular and the entirety of the Amendment generally that the Amendment is a fully integrated contract. The document appears on its face to be a complete agreement,

expressly incorporating only the previously executed Royalty Agreement and amending the earlier contract only "to the extent set forth" in the Amendment. Consequently, it is "conclusively presumed to be a final, complete agreement." Feldman, 21 *Tenn. Prac.* § 8:49 (citations omitted). The plaintiffs have not overcome that presumption. As a result, absent some other relevant exception, the parol evidence rule applies.

The plaintiffs do not actually argue that any other exception applies, but the fraud exception bears some mention. The court recognizes that while fraud—or tort generally—is considered to provide an exception to the parol evidence rule, it appears that, when fraud is alleged, courts typically find that the parol evidence rule does not apply to *tort* claims. *See, e.g.*, *Noblitt*, 2019 WL 7290474, at *8 ("Consistent with this understanding of the role, purpose, scope, and respective limitations of contract and tort law, Tennessee courts have held that contractual defenses, such as the parol evidence rule, are not defenses to tort claims." (citations omitted)). On the other hand, where, as here, the plaintiffs have asserted a separate tort claim and pleaded breach of contract in the alternative, and the alternatively pleaded breach of contract claim presumes that no fraud occurred, then the fraud exception has no application.

So, in sum, the parol evidence rule applies. Because the court finds that the Amendment is fully integrated, Barnes's email may only be "used to interpret the contractual language in line with the parties' intent" and not for the purpose of supplementing the parties' agreement, even if it does not necessarily contradict it. *Indiv. Healthcare Specialists*, 566 S.W.3d at 697. In this light, Barnes's comment can only be taken into consideration without violating the parol evidence rule if it is construed to mean that, as of the date of contracting in February 2014, Delk did not envision terminating the parties' relationship as long as the Product was still selling. Neither that statement nor the express written terms of the Amendment prohibited Delk from changing its mind and

choosing to terminate even if the Product was still selling, as long as it provided at least sixty days' advance notice of its desire to terminate.[3]

There is no dispute in this case that Delk provided the requisite notice. The plaintiff alleges as much in the FAC. (Doc. No. 16 ¶ 67.) Consequently, defendant Delk, as the only defendant against which this claim is asserted, is entitled to judgment as a matter of law on the breach of contract claim premised upon its election to terminate the Royalty Agreement, as amended, effective December 31, 2018.

### F.      Trademark Claims (Counts Six through Eight)

The defendants also seek judgment as a matter of law in their favor on the trademark claims asserted in Counts Six, Seven, and Eight of the FAC. (Doc. No. 49-1, at 21–25.) The plaintiffs' PSAC completely omits the trademark claims, and the plaintiffs' Response to the Motion for Judgment notes that the plaintiffs informed the defendants, even before the defendants filed the Motion for Judgment, that the plaintiffs would seek permission to file a Second Amended Complaint that omitted the trademark claims. (Doc. No. 56, at 21.) The plaintiffs also assert that the defendants agreed to the plaintiffs' proposal to "strike the trademark claims." (*Id.*)

The plaintiffs request that they be permitted to "strike" the trademark claims, presumably meaning that they be dismissed without prejudice. In the alternative, they request that they be

---

[3] In other words, if Barnes's email is instead construed as a promise that Delk would not terminate the Amendment if the Product was continuing to sell, it would have to be understood as supplementing rather than merely explaining the termination provision of the Amendment, which otherwise contains no restrictions on termination other than the timing and notice requirements. Consideration of it, construed thus, would violate the parol evidence rule. On the other hand, if, as the plaintiffs urge, the Amendment were considered only to be partially integrated rather than fully integrated, the court would be able to construe the statement as potentially amending the written agreement without violating the parol evidence rule. *See* Feldman, 21 *Tenn. Practice* ¶ 8.50 (noting that a partially integrated agreement "may not be contradicted by parol evidence, but may be supplemented by consistent, additional terms").

permitted to amend their Response to address the defendants' arguments as to why the claims should be dismissed with prejudice.

The court construes the plaintiffs' request to dismiss the claims without prejudice and their subsequent omission of the claims from the PSAC in light of Rule 41, which permits the voluntary dismissal of claims by court order, "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). The court will deny the motion for judgment as a matter of law as to the trademark claims and will instead dismiss these claims without prejudice.

## II.     MOTION FOR LEAVE TO AMEND

On October 12, 2020, prior to the expiration of the deadline for seeking to amend pleadings, the plaintiffs filed their Motion for Leave to File Second Amended Complaint. Specifically, they seek to amend the operative pleading by: (1) omitting the trademark claims, as discussed above; (2) adding new claims for promissory estoppel and negligent misrepresentation that are based on the same operative facts as the promissory fraud and intentional misrepresentation claims asserted in the FAC; (3) consolidating Counts Three and Four into a single claim for breach of contract; (4) amending the requested relief; and (4) "add[ing] several clarifying factual allegations" that do not appear to be disputed. (Doc. No. 51-1, at 1–2.) They assert that the proposed amendments "will not implicate new issues of proof or law and, as such, will not prejudice Defendants." (*Id.* at 2.) The also represent that they complied with Local Rule 7.01(a)(1), requiring that they confer with opposing counsel, prior to filing this motion.

The plaintiffs' Memorandum in support of the Motion for Leave sets out the legal standards applicable to motions to amend pleadings and argues that their motion meets these standards. The defendants respond by arguing that the motion would be "futile," because both of the proposed new claims—promissory estoppel and negligent misrepresentation—would be subject to dismissal

under Rule 12(b)(6) for failure to state a claim for which relief may be granted. (Doc. No. 55, at 3–4.)

### A. Legal Standards

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend shall be freely granted when justice requires. Leave should generally be granted under Rule 15(a) unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (citation omitted).

The standard for dismissal under Rule 12(b)(6) is the same as that for dismissal under Rule 12(c), already outlined above. Generally, on a motion to dismiss under Rule 12(b)(6), courts must construe the proposed complaint "in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir.2012) (citation omitted). Therefore, the dispositive question is whether the proposed amended complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir.2014)). "[C]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Bright v. Gallia Cty.*, 753 F.3d 639, 652 (6th Cir.2014) (citations omitted).

### B. Promissory Estoppel Claim

Tennessee courts describe the doctrine of promissory estoppel as follows: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance

is binding if injustice can be avoided only by enforcement of the promise." *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982) (quoting Restatement (First) of Contracts § 90). Thus, to succeed on a claim, a plaintiff must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied upon the promise to their detriment." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007). Further, "Tennessee courts generally disfavor claims based upon promissory estoppel." *Holt v. Macy's Retail Holdings, Inc.*, 719 F. Supp.2d 903, 913 (W.D. Tenn. 2010) (citations omitted); *see Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695, 699–700 (Tenn. Ct. App. 2003) ("[T]he Tennessee Supreme Court has. . . limit[ed] the application of promissory estoppel to 'exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud.'" (quoting *Baliles v. Cities Serv.*, 578 S.W.2d 621 (Tenn. 1979)).

The Tennessee courts, however, "have not worked out a uniform standard to determine whether a defendant's words or actions justify the plaintiff's reliance." *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991). That is, while "[s]ome courts hold that the promise must be definite and unequivocal," others hold that the promise may be inferred from the general statements of the promisee." *Id.* (citations omitted). In *Amacher*, the court concluded that this "latter view would seem to be more in line with the Restatement 2d's definition of a promise as 'a manifestation of intention . . . so made as to justify a promisee in understanding that a commitment has been made." *Id.* (quoting Restatement (Second) Contracts § 2). Once it is clear that such a promise has been made, however one arrives at that conclusion, "the resulting promise must be unambiguous and not unenforceably vague." *Id.*

The proposed promissory estoppel claim is based on the same "promise" in the email from Barnes as the promissory fraud claim ("All I can say is that we don't intend to go five years and then not renew if the product is still selling."). The plaintiffs allege that Barnes should reasonably have expected this promise to induce the plaintiffs to enter into the Amendment, that the plaintiffs reasonably and justifiably relied on the promise, and that they suffered economic damages as a result. (PSAC, Doc. No. 51-2 ¶¶ 54–57.) They also assert that the promise is "unambiguous and not unenforceably vague." (*Id.* ¶ 58.)

The defendants argue, first, that Barnes's statement is too vague and ambiguous to be construed as a promise. However, the court has already determined, in the context of the defendants' effort to dismiss the promissory fraud claim, that there is a question of fact in that regard. Moreover, the caselaw referenced above further substantiates that conclusion: Barnes's statement, at least arguably, qualifies as a "manifestation of intention . . . so made as to justify [the plaintiffs] in understanding that a commitment had been made." *Amacher*, 826 S.W.2d at 482 (quoting Restatement (Second) Contracts § 2). The defendants claim that it did not bind Barnes (or Delk) to do or refrain from doing anything, but, broadly construed, Barnes's statement was a commitment not to terminate the Royalty Agreement, as amended, if the Product was "still selling."[4]

---

[4] The defendants do not argue that the promise not to terminate if the Product was "still selling" is itself too vague to enforce, but they could have. What does it mean for the Product to be "still selling"? How many units per what block of time would qualify as "still selling"? As few as ten units per month? Per year? One hundred units? One thousand? However, even if the defendants had argued futility of the promissory estoppel claim (or sought dismissal of the promissory fraud claim) on this ground, the court would likely have found the issue to be one more readily addressed on summary judgment or at trial, as the parties' course of dealing and other background facts might help define the term "still selling."

The defendants next argue that the plaintiffs' allegations of substantial economic loss are insufficient. However, the plaintiffs allege that Russ Adams put Barnes on notice that his livelihood was dependent on his receipt of royalties and that breach of the alleged promise terminated their royalty income from sale of the Product. Elsewhere in the PSAC, they specify that they "suffered damages relating to royalties owed them by Delk" (*id.* ¶ 52), which the court understands to mean that, as a result of the plaintiffs' agreeing to the Amendment, Delk positioned itself to be able to sell the Product after termination of the Royalty Agreement, as amended, but without continuing to pay royalties to the plaintiffs. At this juncture, the court finds the allegations relating to damages to be sufficient.[5]

Finally, the defendants argue that the plaintiffs' argument that they can "properly assert a claim of promissory estoppel even when the parties are bound by a written contract is dubious, at best." (Doc. No. 55, at 6 (citations omitted).) The plaintiffs counter that, under Tennessee law, "promissory estoppel may be applied even where there is a valid contract between the parties, so long as the promise does not change the terms of the contract." (Doc. No. 51-1, at 10 (citations omitted).) They assert that Barnes's promise that he would not terminate the Royalty Agreement if the Product was still selling does not change the terms of the Amendment and instead simply adds a condition to its terms that does not conflict with it, as a result of which Barnes's promise and the Amendment can be interpreted harmoniously. (*Id.*)

---

[5] Eventually, of course, the plaintiffs will be called upon to further clarify how they are worse off rather than better off as a result of signing the Amendment, as the Royalty Agreement otherwise would have expired almost two years earlier than it did as a result of the Amendment. Although the original term could have been extended, either party had the right to terminate by giving just thirty days notice prior to the expiration of the original or any extended term. (*See* Royalty Agreement ¶ 1, Doc. No. 16-5, at 1.) The plaintiffs do not argue that they were induced to enter into the original Royalty Agreement by any representations regarding the parties' right to unilaterally terminate after the first five-year term.

The plaintiffs are correct. Tennessee courts do not allow promissory estoppel claims to proceed "[w]here the parties have an enforceable contract . . . and merely dispute its terms, scope or effect." *Sparton Tech., Inc. v. Util-Link, LLC*, 248 F. App'x 684, 690 (6th Cir. 2007). However, the Tennessee courts have permitted promissory estoppel claims to proceed alongside breach of contract claims "where a claim of promissory estoppel was advanced to expand the terms of, not change the terms of, an existing contract," *id.* (citing *Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 9–11 (Tenn. 1991)), as is the case here.

It is entirely unclear what the promissory estoppel claim adds to the plaintiffs' case that the promissory fraud claim does not already supply, in terms of both the proof necessary to establish the claim and alleged damages associated with it. Nonetheless, the court cannot find at this juncture that the claim is entirely futile.

### C.     Negligent Misrepresentation Claim

In Tennessee, liability for negligent misrepresentation may result when

(1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

(2) the defendant supplies faulty information meant to guide others in their business transaction; and

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and

(4) the plaintiff justifiably relies upon the information.

*John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991).

The plaintiffs' negligent misrepresentation claim is based upon the same statement as their intentional misrepresentation claim: "Either party has to be able to walk away from a contract at the natural termination of the agreement—this is a requirement of a contract." (PSAC ¶ 75, Doc. No. 51-2, at 11 (quoting Doc. No. 16-8, at 1).) Irrespective of whether supplying erroneous legal

advice can form the basis of a negligent misrepresentation claim, the claim as articulated here would be subject to dismissal, and is therefore futile, for the same reason as the plaintiffs' intentional misrepresentation claim: the plaintiffs cannot show that the "information" supplied by Barnes was actually false. (*See* Section I.D., *supra*.)

## III.  CONCLUSION

As discussed herein, the court will grant in part the defendants' Motion for Judgment (Doc. No. 49), dismissing with prejudice part of Count One and the entirety of Counts Two and Four of the FAC, and dismissing without prejudice Counts Six through Eight.

The court, likewise, will grant in part and deny in part the Motion for Leave to Amend (Doc. No. 51). The plaintiffs will be granted leave to file a Second Amended Complaint that amends the FAC by (1) including the new factual clarifications to which the defendants have not objected; (2) omitting in their entirety the trademark claims; and (3) incorporating the new claim of promissory estoppel. The motion will be denied, insofar as the plaintiffs seek to add a futile claim of negligent misrepresentation.

In addition, insofar as the PSAC seeks to reassert claims that have been dismissed from the FAC, pursuant to the defendants' Motion for Judgment on the Pleadings, those claims may not be reasserted, and the effort to do so is clearly futile. Those claims will remain dismissed and will not be deemed reinstated by the filing of the Second Amended Complaint. As a result, although the court will allow the filing of a Second Amended Complaint, only the claims for (1) promissory fraud, (2) promissory estoppel, (3) breach of contract related to the payment of royalties, and (4) declaratory judgment will proceed. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge